## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 19 2018, 9:27 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald E.C. Leicht
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lance Pruitt, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | September 19, 2018 <br><br> Court of Appeals Case No. 18A-CR-224 <br><br> Appeal from the Howard Circuit Court <br><br> The Honorable Lynn Murray, Judge <br><br> Trial Court Cause No. 34C01-1604-F3-76 |

**Mathias, Judge.**

[1]     Lance Pruitt ("Pruitt") was convicted in the Howard Circuit Court of two counts of Level 3 felony robbery and two counts of Level 3 felony criminal

confinement for robbing the same bank twice, first in 2014 and again in 2016. On appeal, Pruitt argues that the trial court lacked probable cause to issue the search warrant police used to obtain a sample of his DNA and that the evidence obtained through the warrant should have been suppressed. He also argues that his aggregate sentence of thirty-two years of incarceration was inappropriate.

We affirm.

## Facts and Procedural History

On the morning of October 24, 2014, the North Washington Street branch of the BMO Harris Bank in Kokomo was robbed. At trial, Derrell Muhammad ("Muhammad") testified that he had driven Pruitt to and from the bank and that Pruitt had entered it and performed the robbery, which the two had planned together. Tr. Vol. II, p. 250; Tr. Vol. III, pp. 3–5.

The bank employees described the robber as a black male, around six feet tall, with a thin build, who brandished a silver semiautomatic handgun. They related that the robber told them to lie on the floor, handed a red cloth bag to one teller, and told her to fill the bag with money from her cash drawer. When the teller had some difficulty opening her drawer, the robber accused her of only pretending not to be able to open it, and chambered a round of his pistol in a threatening manner. The robber also told the teller that if she put any dye packs in with the money, he would return. The robber left the bank with around $9,100.00

[5]     Reviewing the bank's surveillance video, Kokomo Police noted that the robber wore dark pants, a black hooded sweatshirt with white dots and trim, some kind of cloth over his face, sunglasses, and black gloves with Nike logos. Police also noted that the robber held the gun in his left hand. While searching the area near the bank for the suspect, police found several articles of clothing lying on the side of road near the intersection of Fischer Street and Webster Street in Kokomo, around two blocks from the bank. Muhammad would later testify that Pruitt threw these items from Muhammad's girlfriend's car as he drove Pruitt away from the bank. Tr. Vol. III, pp. 5–6. Included in these articles of clothing were a sock cap and black Nike gloves, which investigators sent to the state police lab for DNA testing.

[6]     Based upon anonymous phone calls, police suspected Muhammad and Pruitt were involved in the 2014 robbery. When police interviewed Pruitt on January 30, 2015, he denied any involvement in the robbery and did not consent to provide a sample of his DNA. Although technicians at the state police lab found enough genetic material on the sock cap found near the bank after the robbery to create a DNA profile, without a sample they had nothing to compare it to. Having no other leads, the robbery investigation stalled.

[7]     On the morning of January 11, 2016, the same branch of the BMO Harris bank was robbed again. The suspect was again described as a black male, around six feet in height, with a thin build, this time wearing a gray hooded sweatshirt and wielding a black handgun. Reviewing the bank surveillance video, investigators noted that this robber also held the gun in his left hand, and they observed that

this robber resembled the suspect from the 2014 robbery. During this robbery, the suspect handed the tellers a gray pillow case, and, unlike the 2014 robbery, had the employees open the vault. The robber left the bank with around $140,000.00. At trial, Muhammad testified that Pruitt committed this robbery as well and that he again drove Pruitt to and from the bank. Tr. Vol. III, pp. 8–11.

[8] Four days after the second robbery, on January 15, 2016, Tamara Harrison ("Harrison") came to the Kokomo Police Department and reported that her co-worker, Kirshana Tyler ("Tyler"), was bragging about knowing the bank robbers. Harrison related that Tyler said that the robbers were named Lance (Pruitt's first name) and "Gucci" (which police knew to be Muhammad's nickname), and that they stole $200,000.00. Police interviewed Tyler, who denied making the statements about the robbery. Police also identified Tyler as the sister of Pruitt's girlfriend.

[9] At this point, police applied for and the trial court issued a search warrant to obtain a sample of Pruitt's DNA, analysis of which revealed a match with the profile found on the sock hat recovered near the scene of the 2014 robbery. Incident to his arrest, police searched Pruitt's residence and found over $1,200.00 in single, one-dollar bills, together with a black handgun and gray pillow case consistent with the descriptions of the items used in the 2016 robbery.

[10] After his arrest, Pruitt filed a motion to suppress any evidence obtained as a result of the DNA sample taken from him, arguing that the search warrant to obtain this sample was not supported by probable cause. The trial court denied Pruitt's motion to suppress, and, after a three-day jury trial, Pruitt was convicted of two counts of Level 3 felony robbery and two counts of Level 3 felony criminal confinement (one robbery conviction and one criminal confinement conviction for each of the 2014 and 2016 robberies).

[11] On December 27, 2017, the trial court conducted a sentencing hearing. Consulting Pruitt's pre-sentence investigation report ("PSI"), the trial court found as aggravating circumstances Pruitt's prior convictions, which included a misdemeanor conviction for an assault committed in Ohio in 2008, and two felony convictions for criminal recklessness for shooting a firearm into a dwelling or gathering. The trial court also noted that Pruitt's first adult arrest was at the age of eighteen, that he had a history of arrests in Indiana, Ohio, and Illinois, and that he committed the robberies despite having previously spent three years in the Department of Correction ("DOC") for the criminal recklessness charges. The trial court also found it significant that Pruitt obtained nearly $150,000.00 from the two robberies, most of which was never recovered, and recounted that, based on their testimony, the bank employees seemed to have feared for their lives.

[12] Finding no mitigating circumstances, the trial court imposed the sentence recommended in the PSI of sixteen years for each of Pruitt's four convictions. It ordered the two sentences resulting from the 2014 robbery to be served

concurrently, as it likewise did for the two sentences resulting from the 2016 robbery. The two blocks of sentences were to be served consecutively, resulting in an aggregate sentence of thirty-two years in the DOC. Pruitt now appeals.

## I. Probable Cause

[13] On appeal, Pruitt argues the trial court erred in granting the search warrant to obtain his DNA sample and in denying his motion to suppress the evidence obtained as a result of this warrant. Specifically, Pruitt contends that the warrant was not supported by probable cause because the only information in the officer's probable cause affidavit implicating him of the robberies was a general description of a tall, thin, black man, and Harrison's recounting of Tyler's statement, which Pruitt argues was uncorroborated hearsay because Tyler denied making the statement when interviewed by police.

[14] A warrant and its underlying affidavit must comply with the Fourth Amendment prohibition on unreasonable searches and seizures, as well as Indiana constitutional and statutory law. *Fuqua v. State*, 984 N.E.2d 709, 716 (Ind. Ct. App. 2013) (citing *Gray v. State,* 758 N.E.2d 519, 521 (Ind. 2001)), *trans. denied*. Both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution require probable cause for the issuance of a search warrant. *Rader v. State*, 932 N.E.2d 755, 758 (Ind. Ct. App. 2010) (citing *Mehring v. State*, 884 N.E.2d 371, 376 (Ind. Ct. App. 2008), *trans. denied*). The constitutional principles of Article I, Section 11 and the Fourth Amendment are codified in Indiana Code section 35-33-5-2, which details the

information to be contained in an affidavit for a search warrant. *Fuqua*, 984 N.E.2d at 716.

[15]  "Probable cause is a 'fluid concept incapable of precise definition . . . [and] is to be decided based on the facts of each case.'" *Id.* "In deciding whether to issue a search warrant, the issuing magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place." *Id.* (quoting *Casady v. State*, 934 N.E.2d 1181, 1188–89 (Ind. Ct. App. 2010), *trans. denied*).

[16]  The duty of a reviewing court is to determine whether the issuing magistrate had a substantial basis for concluding that probable cause existed. *Id.* (citing *Casady*, 934 N.E.2d at 1189). We review the question *de novo*, but give significant deference to the issuing magistrate's determination and focus on whether reasonable inferences drawn from the totality of the evidence support the finding of probable cause. *Id.* "In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases are to be resolved in favor of upholding the warrant." *Casady*, 934 N.E.2d at 1189. Probable cause to search a location is established when a sufficient basis of fact exists to permit a reasonably prudent person to believe that a search of that location will uncover evidence of a crime. *Helsley v. State,* 809 N.E.2d 292, 295 (Ind. 2004) (citations omitted).

[17] Where a warrant is sought based on hearsay information, the affidavit must either: (1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or (2) contain information that establishes that the totality of the circumstances corroborates the hearsay. *State v. Spillers*, 847 N.E.2d 949, 953–54 (Ind. 2006) (citing Ind. Code § 35-33-5-2(b)(1) and (2)). The trustworthiness of hearsay for the purpose of establishing probable cause can be shown in a number of ways, including where: (1) the informant has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) some basis for the informant's knowledge is demonstrated, or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. *Id.* at 954 (citing *Jaggers v. State,* 687 N.E.2d 180, 182 (Ind. 1997)). These examples however are not exclusive. *Id.*

[18] Pruitt seems to argue that the bank employees' descriptions of the suspect, as relayed in the probable cause affidavit, were too generic to permit a reasonably prudent person to conclude that a sample of Pruitt's DNA would implicate him in the robberies. In his affidavit, the lead investigator in the case, Detective Banush, stated that Pruitt "matches the physical description[s] of the robbery suspect" provided by bank employees after both the 2014 and 2016 robberies, who described the suspect as "a black male . . . approximately 6-0 in height, [with a] thin build." Appellant's App. Vol. II, pp. 73–74.

[19]  Pruitt also argues that Harrison's statement, in which she told police that her co-worker, Tyler, had implicated Pruitt for the 2016 robbery, was unreliable and uncorroborated hearsay. Citing the trustworthiness factors from *Jaggers*, Pruitt argues that Harrison's statement was unreliable because the affidavit "did not allege that [] Harrison had 'given correct information in the past.' Nor did it allege a 'basis for the informant's knowledge' or that the informant had predicted any particular activity." Appellant's Br. at 14. Pruitt also contends that the police investigation did not corroborate this statement, because, when interviewed, Tyler denied making the statement to Harrison.

[20]  The State argues that the affidavit did assert a basis for Harrison's knowledge when it specified that Harrison claimed to have heard that Pruitt had committed the robbery from her co-worker, Tyler. The State further argues that Tyler's denial of making this statement to Harrison was not credible because the affidavit specifies that "Tyler was also identified as the sister of Lance Pruitt's girlfriend." Appellee's Br. at 16. The State asserts that Harrison's statement was more credible because Harrison came to the police voluntarily, and within four days of the 2016 robbery provided information implicating Pruitt, which "could have been detrimental to give to law enforcement." *Id.* While acknowledging that the general descriptions and the hearsay statement may have been insufficient to create probable cause separately, the State argues that considering the totality of the circumstances, they together did create probable cause supporting the search.

[21]    The State also argues that even if the affidavit did not establish probable cause, suppression of the evidence obtained through the search warrant was still not required because of the good faith exception. We need not consider the application of the good faith exception, as we find that the affidavit at issue established probable cause for the search.

[22]    First, while the investigators' interview of Tyler did not corroborate Harrison's statement, Tyler's denial did not clearly undermine Harrison's account either. As the affidavit notes that Tyler was Pruitt's girlfriend's sister, it supplies both a basis for Tyler's (and hence Harrison's) knowledge of Pruitt's guilt, and also a reason why the trial court could reasonably conclude that Tyler was biased and had an interest in denying that she inadvertently implicated her sister's boyfriend of robbing a bank. By contrast, the affidavit contains nothing indicating that Harrison had anything to gain personally by reporting what Tyler had told her to the police. We have previously held that a trial judge was justified in crediting the word of a concerned citizen who did not have any known criminal connections or ulterior reason for coming forward to police. *See Scott v. State*, 883 N.E.2d 147, 155 (Ind. Ct. App. 2008).

[23]    Additionally, while the bank employees' descriptions of the suspect were rather general and could arguably apply to a sizeable number of people, Pruitt did match these descriptions, and the descriptions provided some evidence implicating him of both the 2014 and 2016 robberies. Further, the affidavit contained several facts supporting the conclusion that both robberies were committed by the same suspect, including Detective Banush's observation

(based on the surveillance video) that the two suspects resembled each other, that both suspects held their guns in their left hands, that both robberies were of the same bank, both took place during the morning, that both suspects wore hooded sweatshirts, and that both suspects entered with a cloth bag or sack to carry the stolen money out in.

[24] Taken together with all of these facts, Harrison's hearsay statement implicating Pruitt of the 2016 robbery could also reasonably support the conclusion that Pruitt committed the 2014 robbery, and therefore that his DNA would match the DNA on the clothing found near the scene of the 2014 robbery. Pruitt does not suggest that any of the statements contained in the affidavit were in any way false or misleading, and while Pruitt argues that the facts supplied in the affidavit were insufficient to establish probable cause, he does not address the good faith exception, or argue that the affidavit was so lacking in evidence of probable cause so as to render reliance on it entirely unreasonable.[1] If he had made such an argument, we would reject it.

[25] While the hearsay statement, the descriptions, and the various facts suggesting that one suspect committed both robberies would likely be insufficient to

---

[1] Pruitt appears to insinuate that the trial court's reliance on the employee's generic description of the robber could amount to racial profiling and call into question its impartiality: "Can a neutral, detached magistrate conclude that Pruitt is the only black male in the population frequenting Howard County that 'matches the physical description of the robbery suspect?' No. To do so would lend credence to people now protesting profiling of races." Appellant's Br. at 13. In truth, the trial court need only have concluded, and did conclude, that Pruitt was *one* person matching the descriptions, and that he was also implicated by the statement of a citizen informant with no apparent motive in coming to police other than to report a robbery.

establish probable cause individually, taken together, they provide enough evidence of probable cause that we cannot say the issuance of the search warrant or the officers' reliance upon it unreasonable. Thus, we conclude that even if the warrant to obtain Pruitt's DNA sample did lack probable cause, the officers' reliance upon it was in objective good faith and the suppression of the resulting evidence was therefore not required.

## II. Appropriateness of Sentence

Pruitt also argues that his aggregate thirty-two-year sentence was inappropriate in light of the nature of the offense and his character. The Indiana Constitution authorizes independent appellate review and revision of a trial court's sentencing decision. *Wampler v. State*, 67 N.E.3d 633, 635 (Ind. 2017). Appellate courts implement this authority through Indiana Appellate Rule 7(B), which provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

In conducting our review, "[w]e do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate." *Grimes v. State*, 84 N.E.3d 635, 645 (Ind. Ct. App. 2017) (quoting *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012)), *trans. denied*. "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence

portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Ultimately, our principal role is to leaven the outliers rather than necessarily achieve what is perceived as the correct result. *Cardwell*, 895 N.E.2d at 1225. The defendant bears the burden to establish that his sentence is inappropriate in light of his character and the nature of his offense. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[28] With regard to the nature of his offense, Pruitt first contends that:

> In both of the bank robberies at issue here, no one was hurt and the time any BMO Harris employee was in fear was very, very short in duration. To maximize sentences under this "nature of the crime" would require equaling these circumstances with, for example, a situation where a robber was confronted by police during a robbery and escalated to a hostage situation encompassing, say, twelve hours of terror, with threats to kill the hostages.

Appellant's Br. at 17. Pruitt appears to be arguing that the maximum sentence was inappropriate here because a more violent, more psychologically traumatic, version of a bank robbery can be imagined.[2] This, in effect, is an argument that the worst maximum sentence should be reserved for the very worst offenders.

_____

[2] Though Pruitt does not expressly state this, we note that the sixteen-year sentences he received for each of his Level 3 felony convictions were the statutory maximum sentence he could have received for Level 3 felonies. Ind. Code § 35-50-2-5.

While we can certainly envision more heinous robberies, Pruitt cannot produce "compelling evidence" of restraint or other factors which cast his crime in a positive light. *Cardwell*, 895 N.E.2d 1219. One of the bank employees testified that when she had trouble opening her cash drawer, the robber threatened her by chambering a round into his gun. Tr. Vol. II, pp. 44, 51. The trial court was also free to disagree with Pruitt's characterization of the robberies as having a limited impact on the bank employees. At sentencing, the trial court refused to consider it a mitigating factor that there was no evidence that Pruitt intended to harm anyone and that no one was physically hurt, remarking that "[w]hat Mr. Pruitt did is to walk into BMO Harris . . . and basically put [the employees] in fear for their lives. . . . I could sense and we could all hear it during the trial when they testified as to what a horrific experience that was for them." Tr. Vol. III, p. 94.

[29] It was also proper for the trial court to weigh this aspect of the nature of the offense in relation to the various other aggravating factors, including the fact that most of the $150,000.00 was never recovered, Pruitt's criminal history, which included prior felony convictions involving the reckless handling of a firearm, and the apparent failure of his prior incarceration to rehabilitate him, as evidenced by the subsequent robberies. Thus, we conclude that Pruitt has failed to demonstrate that the nature of his offense entitles him to a revision of his sentence.

[30] In relation to his character, Pruitt argues, as he did at his sentencing hearing, that he is "healthy" and "has a history of marijuana use, but not (apparently)

other drugs," and that since he "is not a slave to addiction, the issue becomes the appropriate time in prison necessary to rehabilitate an otherwise healthy, mentally and physically, individual." Appellant's Br. at 17. While a lack of substance abuse problems could simplify his rehabilitation, he develops no argument explaining how this would entitle him to a lesser sentence.

[31] Finally, Pruitt points out that "he has three (3) children" and was employed at the time of the offenses. *Id.* But he develops no argument explaining how these facts should entitle him to a revised sentence either. Indeed, it is unclear why Pruitt mentions his children, as he does not appear to argue undue hardship, and we can find little evidence in the record supporting such an argument.[3]

[32] For all of these reasons, Pruitt has failed to carry his burden of demonstrating that his sentence was inappropriate in light of the nature of his offenses or his character.

## Conclusion

[33] Based on the facts and circumstances before us, we conclude that the challenged affidavit supplied adequate evidence of probable cause for the trial court to authorize the search warrant at issue. Further, in light of the nature of Pruitt's offenses and his character, we cannot conclude that his sentence was

---

[3] Pruitt's PSI lists his three children as living with their mothers, one of whom lives in Wisconsin, another in an unlisted location, and a third in Kokomo. Appellant's App. Vol. III, p. 11. The PSI also stated that Pruitt had been court-ordered to pay child support in the amount of $25 per week for each of his children. *Id.* It is unclear from the record whether Pruitt had been making such payments, as is whether he had custody of any of his children prior to his arrest following the 2016 robbery.

inappropriate. We therefore affirm Pruitt's conviction and the trial court's sentence.

Bailey, J., and Bradford, J., concur.